UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Richard E. Petroske,

        Plaintiff,

v.

Kohler Co.,

        Defendant.

Civil No. 11-125 (JNE/FLN)
ORDER

Plaintiff Richard E. Petroske ("Petroske") brought this action against Defendant Kohler

Co. ("Kohler"), his former employer, seeking recovery of long-term disability benefits under an

employee benefit plan.  Petroske commenced this action in the Anoka County District Court in

December 2010, alleging breach of contract.  Kohler removed the case to federal court because

the claim was preempted by Section 502(a) of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1132(a) (2006); *see Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987);

*Estes v. Fed. Express Corp.*, 417 F.3d 870, 872-73 (8th Cir. 2005).  Both parties have now

moved for Summary Judgment.  For the reasons stated below, the Court grants Kohler's motion

and denies Petroske's motion.

## I.       BACKGROUND[1]

### A.  The Disability Plan

Petroske began working for Kohler on a full-time basis as a cabinet installer on

September 13, 1998. He stopped working for Kohler in 2003.  During his employment and at all

times relevant to this litigation, Kohler has maintained a "Pay Protection Plan" ("Plan").  Kohler

both administers and pays benefits under the Plan.  The Plan states:

---

[1]     The facts described below are those contained in the administrative record.

After you have been totally disabled for a period of 26 weeks and received your Short-Term Disability or Salary Continuation benefit payments, you will be paid 60% of your base salary under the Long-Term Disability Plan.

Under the Plan, "Long-Term Disability benefits will begin after you have been totally disabled for 26 weeks." The Plan defines "total disability" as:

- During the first 24 months of disability, you must be totally disabled from performing any and every duty of your occupation or similar job.

- After 24 months, you must be totally disabled from performing any occupation or employment.

You must always be under the care of a licensed physician during your disability. In addition, your disability must be medically verified and satisfactory to the Company before your Long-Term Disability benefits will begin.

The Plan also states:

Payments and final decisions on all claims are the sole responsibility of the Company. If Kohler Co. requests proof of disability, it must be satisfactory to the Company in order for benefits to be paid.

## B. Petroske's Medical History

Petroske stopped working for Kohler as a result of his undergoing surgery to repair a torn meniscus. In the following months, he began experiencing symptoms including lightheadedness, dizziness, fatigue, headaches, shortness of breath, double vision (diplopia), droopy eyelids, and facial numbness. In late 2003, Petroske saw Dr. Neil Henry, who assessed Petroske as suffering from weakness and diplopia. In December 2003, Petroske told Dr. Henry that he was too fatigued to be able to work. Petroske was sleeping three to four hours during the day, became tired from walking to his mailbox, and had trouble keeping his eyelids open. Dr. Henry assessed Petroske as suffering from "syndrome of tiredness and diplopia" with "poss[ible] myasthenia gravis." On this date, Dr. Henry also completed a Kohler "Disability Claim Form," explaining that Petroske was unable to work due to generalized weakness and fatigue.

2

On February 10, 2004, Petroske saw ophthalmologist Dr. Howard Pomeranz for an evaluation of his headaches and visual disturbances.  Dr. Pomeranz did not find any objective abnormalities and noted that Petroske suffered from a "[s]ubjective visual disturbance of unclear etiology possibly due to diabetic maculopathy."  Petroske also saw ophthalmologist Dr. Eric Steuer, who did not find any evidence of macular disease and did not believe Petroske's visual problems and headaches were related to his retinas.  Dr. Steuer opined that Petroske's symptoms could possibly be due to either a connective tissue disorder or some other undefined neurological problem.

On April 19, 2004, Petroske saw neurologist Dr. David Walk, who noted that Petroske's headache was only present when Petroske was seated.  Dr. Walk remarked that Petroske "has subjective diplopia with no objective findings" that was "associated with a postural headache syndrome."  He arranged for an MRI to determine the etiology of Petroske's symptoms.

Over the next few months, Petroske underwent an extensive evaluation at the Mayo Clinic.  On July 23, 2004, Petroske saw neurologist Dr. Charles Hall, who believed Petroske likely had some variant of postural orthostatic tachycardia syndrome (POTS).[2]  At that time, Dr. Hall noted abnormalities in Petroske's blood pressure readings, specifically noting several instances of blood pressure changes accompanied by increases in heart rate to above 120 beats per minute.  Dr. Hall diagnosed Petroske with "orthostatic headache without CSF leak and postural tachycardia syndrome" and recommended that Petroske discontinue his Lasix and wear support hose.  Dr. Hall also recommended that Petroske could wear an abdominal binder, tip the head of his bed up, and increase the salt and protein intake in his diet.  On August 13, 2004, at

---

[2]     On September 21, 2004, Dr. Hall noted that Petroske's symptoms were *not* likely POTS, and instead diagnosed him with "postural headaches" and "postural intolerance."

Petroske's request, Dr. William Evans from the Mayo Clinic submitted physician reports and documentation of Petroske's "various illnesses and our opinion that he is permanently disabled."

On August 16, 2004, Petroske saw neurologist Dr. Eduardo Benarroch at the Mayo Clinic, who noted that Petroske's headaches were associated with sitting or standing and were relieved relatively quickly by lying down.  Dr. Benarroch noted that Petroske's test results "revealed normal post-ganglionic sudomotor and cardiovagal function" and that Petroske's "orthostatic intolerance with excessive tachycardia upon standing . . . could be consistent with deconditioning, hypovolemia, hyperadrenergic state such as anxiety, or less likely limited adrenergic neuropathies."  Dr. Benarroch did not believe that orthostatic intolerance was the cause of the postural headaches, and recommended that Petroske perform resistance exercises in the lower extremities, increase the amount of sodium in his diet, discontinue his Lisinopril, and wear support stockings.

On August 30, 2004, neurologist Dr. Bahram Mokri, a specialist in postural headaches at the Mayo Clinic, examined Petroske.  He noted that Petroske's imaging studies had revealed normal results and diagnosed Petroske with orthostatic headaches.  He noted that POTS is a possibility, but that "[t]he question may remain as to whether this orthostatic intolerance is a function of deconditioning or is the cause of the headache."  Dr. Mokri recommended symptomatic treatment, a medication adjustment, and use of an abdominal binder.

On September 21, 2004, Dr. Hall again saw Petroske and noted that Petroske "currently still has headaches on attaining an upright position.  He is able to hunt and fish and move about quite easily without having headaches, but it is shortly after he rests that his headaches recur in the upright position.  This is not likely postural orthostatic tachycardia syndrome.  This is not

likely a manifestation of autonomic failure. . . .  He will most likely benefit with exercises to improve his conditioning and orthostatic tolerance."

On October 1, 2004, Dr. William Evans completed the summary of Petroske's evaluation at the Mayo Clinic.  He summarized Petroske's final diagnoses as: postural headache, postural intolerance, cervical spondylosis with mechanical neck pain, Type II diabetes, fatigue, and dependent edema.  With respect to the headaches, the recommendations were that Petroske wear a waist-high compression garment and decrease his coffee consumption.

Dr. Scott Moses saw Petroske on April 4, 2005.  The notes from that visit indicate that Dr. Moses saw Petroske for his orthostatic headaches in March 2005, at which time Dr. Moses recommended exercise and weight loss.  On the April 4th visit, Dr. Moses noted that Petroske's blood pressure rose from 135/95 when lying down to 152/100 when standing, and his pulse increased from 76 to 92.  Petroske's "active problem list" as of April 2005 was: orthostatic headache, POTS, Type II diabetes, Obesity, Anemia NOS, sleep apnea, high blood pressure, and hyperlipidemia.

On July 12, 2005, Petroske returned to see neurologist Dr. Hall after coming back from a fishing trip in Canada.  Dr. Hall noted that Petroske's blood pressure "has been very stable" and that the orthostatic hypotension had resolved.  Dr. Hall had "not recorded a low blood pressure on [Petroske] in some time" and "[n]o primary disorder of blood pressure regulation was discovered."  "With adjustment of his medications, Mr. Petroske has actually done very well."  Dr. Hall also noted that Petroske continued to complain of postural headaches upon standing or sitting upright for prolonged periods of time, which was most likely a primary headache disorder.  Dr. Hall encouraged Petroske to go back to work and "become as active as he possibly can."  The only restriction Dr. Hall noted was that Petroske "might need to recline for periods of about

15 minutes every two hours while at work.  As of July 2005, Petroske's double vision had apparently improved as well.[3]

On July 28, 2005, Petroske saw neurologist Dr. Gerald Dove for evaluation of his postural headaches.  Dr. Dove's notes state that "[t]he headache is more of a nuisance type headache.  It is not very severe.  It tends to be a 4/10."  Petroske also reported symptoms of double vision, photophobia, phonophobia, difficulty swallowing, droopy eyelids, and shortness of breath.  Dr. Dove reviewed Petroske's previous medical evaluations and noted that Petroske's postural hypotension has resolved.  His physical examination was unremarkable and Dr. Dove recommended further testing to evaluate Petroske's diplopia, shortness of breath, and fatigue.  He suggested a trial of Topamax to treat Petroske's headaches.  Petroske followed up with Dr. Dove on September 12, 2005, at which time Dr. Dove noted that the Topamax had not helped with the headaches and that they should gradually taper off that drug and try a different medication instead.[4]  All blood testing had been negative and Petroske's physical examination was normal.

Petroske again saw Dr. Dove on October 11, 2005, continuing to complain of orthostatic lightheadedness, headaches, and diplopia.  Dr. Dove again noted that all testing had been negative and the physical examination revealed no abnormal findings.  Based on this visit, Dr.

---

[3]      On July 12, 2005, Dr. Hall completed Kohler's Attending Physician's Supplementary Medical Report, in which he noted Petroske's diagnoses as orthostatic hypotension and postural headaches.  Under "objective findings," Dr. Hall noted "decreased blood pressure on prolonged standing—resolved."  He marked that Petroske's condition had improved and that he was classified as a "Class 2" physical impairment, meaning a "[s]light limitation of functional capacity; capable of light manual activity."  Dr. Hall expected marked improvement in the future due to "medical management" of Petroske's condition.  He believed Petroske was a suitable candidate for part-time work in his own job and other work.  The only work restrictions Dr. Hall noted were that Petroske should avoid prolonged standing and should be able to recline for 15 minutes every 2 hours.

[4]      Petroske chose not to take the new medication because of its potential side effects.

Dove completed Kohler's Attending Physician's Supplementary Medical Report, listing diagnoses of diabetic polyneuropathy, diplopia, orthostatic hypotension, and orthostatic headaches.  He noted that Petroske's condition remained "unchanged" and that he was classified as a "Class 3" physical impairment—meaning a "[m]oderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity."  Dr. Dove believed Petroske may be a suitable candidate for sedentary work, since the headaches that occur with standing "are incapacitating."

On November 29, 2005, Petroske saw Dr. Dove for eyelid spasm and twitching.  Dr. Dove noted that Petroske's orthostatic lightheadedness and headaches "continue[] to be a persistent problem" that have resulted in Petroske being unable to work.

On January 23, 2006, Dr. Dove completed Kohler's "Disability Plan Attending Physician's Statement," noting that due to the postural headaches, Petroske "cannot be upright for sustained periods, and due to his diplopia cannot read or look at computer screen for extended periods."  Dr. Dove included no objective findings, but stated that Petroske's condition remained "unchanged" and classified Petroske as a Class 5 physical impairment, meaning a "severe limitation of functional capacity; incapable of minimal (sedentary) activity."  He did not believe Petroske was a suitable candidate for any type of work.[5]

Dr. Dove saw Petroske again on June 22, 2007, this time for back pain.  An MRI of Petroske's lumbar spine revealed severe stenosis, for which he underwent a laminectomy with decompression on October 31, 2007. He continued to complain of back pain on November 25, 2008, for which Petroske's surgeon, Dr. James Schwender, recommended reconditioning and core stabilization.

---

[5]     Dr. Dove provided similar opinions in Attending Physician Statements dated November 28, 2006, November 6, 2007, November 3, 2008, and October 20, 2009.

Between June 2007 and January 2010, the record contains no evidence of any medical visits related to Petroske's headaches.  On January 25, 2010, after Kohler's January 5, 2010 denial of Petroske's disability claim, Petroske again saw Dr. Dove for follow-up.  Dr. Dove noted that Petroske "has a chronic problem with orthostatic intolerance and headaches" which is "an old problem for him for which he has been disabled from work."  He described the headaches as **"bothersome"** and that "they occur when he stands.  The minute he lies down, they get better."  His physical examination was unremarkable.[6]

On April 7, 2010, Petroske was seen by Dr. Moses for follow-up of his diabetes.  Dr. Moses's notes indicate that Petroske was "being treated with oral agents, diet, [and] exercise."  Under "Patient concerns," Dr. Moses noted that Petroske was concerned about warts, his left index finger, and medication refills.  The notes from this visit indicate that the most recent follow-up of Petroske's headaches with Dr. Moses was on January 22, 2007, at which time they were stable, but persistent postural headaches.  The plan outlined by Dr. Moses after this visit was to "increase activity," along with a medication change and further follow-up of blood sugars and cholesterol.  The most recent medical visit in the record was on June 3, 2010, when Petroske saw a physician assistant for a tick bite—his headaches were not discussed.

## C.  Claims History

Petroske applied for Short Term Disability ("STD") benefits with Kohler on December 5, 2003, stating that he suffered from generalized weakness, diplopia, and headaches.  Kohler deemed him qualified and paid Petroske STD benefits for the maximum period of twelve weeks.  Petroske then filed with Kohler a claim for Long Term Disability ("LTD") benefits on February 16, 2004.  He was approved for benefits beginning on February 27, 2004.

---

[6]    Based on this visit, Dr. Dove later completed a Long Term Disability General RFC Questionnaire for Kohler on August 11, 2010.

Petroske also filed a claim for Social Security Disability benefits on February 6, 2004. The claim was initially denied on March 24, 2004 and again denied upon reconsideration on November 17, 2004.  In a decision dated December 21, 2005, Administrative Law Judge ("ALJ") Peter C. Erickson determined that Petroske was entitled to a period of disability benefits commencing June 1, 2004.  Judge Erickson found that Petroske was severely impaired by POTS with headaches, fatigue and dizziness, and diabetes with peripheral neuropathy.  The ALJ found that those impairments imposed "significant limitations on the claimant's ability to function" and that Petroske "has the residual functional capacity for part-time sedentary work (not more than 12 hours per week) involving lifting ten pounds or less; standing or walking no more than two hours in an eight hour day with no prolonged standing and with position changes at will; the opportunity for extra rest periods; the opportunity to lie flat occasionally; occasional stooping, kneeling, crouching, or crawling; no climbing; no overhead work, static neck flexion or frequent neck rotation."

Kohler informed Petroske on October 31, 2005 that it would be discontinuing payment of his LTD benefits as of December 4, 2005.  Petroske appealed this denial and submitted medical information indicating that he was disabled due to orthostatic lightheadedness and headaches as well as fatigable diplopia.  Based on the additional medical information, along with the favorable determination from the Social Security Administration, Kohler reinstated Petroske's benefits effective December 5, 2005.

On September 29, 2009, Kohler conducted a periodic full review of Petroske's claim. Kohler requested that Petroske provide a Supplementary Medical Report (to be completed by his physician), an activity report (to be completed by Petroske), authorization for disclosure of

health information, and complete medical records from all treating physicians from January 1, 2007 to September 2009.

Petroske completed the activity report on October 5, 2009.  In that report, Petroske noted that he engages in gardening, fishing and hunting "when I'm up to it, and can lay down if I get [tired] or have help."  He stated that he has gone camping on weekends, but only when he has someone to help.  He also noted that he is able to drive a car about 20 to 25 miles "if I feel up to it."  He stated that he is able to participate in some social activities, "if I can lay down usually an hour or two."  Petroske reported that he cannot tolerate "being vertical" and that he needs to lie down if he gets tired.  He stated that he is not receiving treatment for his headaches, other than rest.  He reported no weight limitations and that his only restriction was to "do what I can tolerate and lay down [frequently]."  In an eight-hour day, Petroske reported that he is able to stand/walk for 1-4 hours, sit for 1-3 hours, bend and twist frequently, reach occasionally, and cannot climb at all.

Dr. Dove completed an Attending Physician's Supplementary Medical Report on October 20, 2009.  When Dr. Dove completed this form, his last visit with Petroske had been on June 22, 2007.  Dr. Dove only listed "headaches" as Petroske's diagnosis.  He noted subjective symptoms of headache, back pain, and leg pain.  Under "objective findings," Dr. Dove listed diabetic polyneuropathy, orthostatic hypertension,[7] and headaches, but included no objective signs, laboratory data, or results from any diagnostic studies.  He again noted that Petroske's condition remained "unchanged" and classified Petroske's physical impairment as a "Class 5."  Under "work restrictions," Dr. Dove reported that Petroske "cannot sit upright for any prolonged period

_____

[7]     This is the first mention of orthostatic hypertension, rather than orthostatic hypotension. The Court assumes this was an error.

of time due to his positional headaches."[8]  Dr. Dove also noted that Petroske "has dizziness when standing and reading."  He did not believe Petroske was a suitable candidate for any type of employment.

Along with the activity report and medical report, Petroske also submitted the notes from his June 22, 2007 visit with Dr. Dove, in which Dr. Dove evaluated Petroske's back pain.  On January 5, 2010, following a review of the documents Petroske submitted, Kohler sent Petroske a letter informing him that based on the recent Attending Physician's Supplementary Medical Report, Petroske's activity report, and the June 22, 2007 medical record, Petroske did not qualify for LTD benefits and his payments would be discontinued as of January 5, 2010.

On January 12, 2010, Petroske appealed the denial.  He enclosed with his appeal an Attending Physician's Supplementary Medical Report dated February 8, 2010, completed by Dr. Dove, which listed Petroske's diagnoses as "headache, back pain, diabetic polyneuropathy, leg pain, orthostatic hypotension."  The report did not include any physical examination findings, laboratory data, or results from imaging or other diagnostic studies.  Dr. Dove classified Petroske's physical impairment as a "Class 4," meaning a "marked limitation."  He did not note any specific work restrictions, but he did comment that Petroske "cannot work" and that "orthostatic headaches make it impossible for patient to stand or sit for any length of time."  Petroske also submitted the medical notes from his appointment with Dr. Dove on January 25, 2010.

Kohler responded with a letter dated March 1, 2010, in which James Jost, a registered nurse and Certified Occupational Health Nurse Specialist at Kohler, found that Petroske was no longer entitled to LTD benefits.  Jost reviewed the medical records and commented on

---

[8]  There is an additional remark concerning Petroske's reported diplopia, but the notation is illegible to the Court.

Petroske's consistently normal examination findings, lack of abnormal ophthalmologic findings, and lack of CSF leak or inter-cranial hypotension.  Jost found that the medical records provided no documented evidence of postural tachycardia or orthostatic hypotension.  Jost referred to Dr. Hall's 2005 notes, which described Petroske's condition as a primary headache disorder and recommended that Petroske return to work and become as active as possible.  He also identified three medications that are associated with headaches as a possible adverse side effect, and noted that exercise and weight loss can reduce the need for these medications and thus eliminate their side effects.  Jost also referred to Petroske's activity report, in which Petroske indicated that he engaged in a number of activities and although he may need help with the activities, Petroske did "not indicate a disability preventing [him] from performing these physical activities."  Jost noted,

> After reviewing your medical record and activity report, the evidence shows:
> - You have the ability to use your hands and arms to perform tasks.
> - You have the ability to stand and walk without assistance.
> - You have adequate vision to take part in normal daily activities.
> - Your headaches have not severely affected any of your body systems.
> - You have enough energy to do many activities and tasks.
> - In combination, your impairments are not severe enough to be totally disabling.
>
> Based on this evidence, I am not convinced your condition is so severe as to prevent you from working in some capacity or to prevent you from performing "any" occupation or employment.  Therefore, I am not convinced you are entitled to receive LTD benefits.

Petroske retained attorney William J. Marshall, who appealed the denial via letter dated August 26, 2010.  Marshall reviewed the medical records and stated that Petroske satisfied the definition of "disability" in the Plan.  Among other records, Marshall sent Kohler a Long Term Disability General RFC Questionnaire that Dr. Dove completed on August 11, 2010.  The RFC Questionnaire indicated that Dr. Dove had treated Petroske for orthostatic headaches, orthostatic

hypotension, and diabetic polyneuropathy.  When asked to identify the clinical findings and

objective signs of the diagnosed conditions, Dr. Dove wrote "increased headaches with

standing."  He believed Petroske was "incapable of even low stress jobs," was unable to

ambulate effectively unassisted to perform daily activities, and that "symptoms will interfere to

the extent that the patient is unable to maintain persistence and pace to engage in competitive

employment."  Dr. Dove opined that Petroske was not even capable of functioning on a part-time

basis in a competitive work setting.  He also noted that Petroske's fatigue would severely impair

his ability to work.  If Petroske were to resume work, during an eight-hour work day, he would

require eight breaks of thirty minutes each.  Dr. Dove also noted that Petroske could occasionally

lift and carry weight of up to fifty pounds, could walk one hour without rest, could sit for ninety

minutes and stand for sixty minutes continuously at one time, would need a job that would

permit Petroske to change positions at will from sitting, standing, or walking, and would need to

change positions every thirty minutes.  According to Dr. Dove, Petroske could occasionally

bend, twist, stoop, climb, kneel, crouch, crawl, reach, pull, push, firmly grasp, finely grasp,

perform overhead work, flex his neck, rotate his neck, and walk up an incline.  Dr. Dove reported

that Petroske could perform repetitive activities involving his hands, arms, and upper extremities,

and that he has good use of both hands and fingers for manual dexterity and repetitive hand-

finger actions.  Dr. Dove believed that in an eight-hour day, Petroske could sit for less than two

hours and stand/walk for less than two hours.   Dr. Dove responded that if Petroske returned to

work, it would extremely increase the severity of his symptoms.  He believed Petroske's

symptoms moderately impaired his ability to perform activities of daily living and maintain

social functioning, and markedly impaired his ability to maintain concentration, persistence, or

pace.  Finally, Dr. Dove commented that due to Petroske's inability to stand up continuously for

more than 90-120 minutes, "he is unable to maintain any competitive pace that a normal 8 hour a day, 40 hour a week occupation would require."[9]

Based on Marshall's letter and additional documentation, on October 15, 2010, Kohler notified Marshall that it was extending the appeal period so that it could conduct a comprehensive medical review in Petroske's claim.  On November 30, 2010, Kohler again denied Petroske's appeal, finding that Petroske was not "totally disabled" as defined under the Plan.  The letter emphasized that under the Plan, a "total disability" requires that "you must be totally disabled from performing any occupation or employment" and that "disability must be medically verified."  The letter explained that the decision was based on the terms of the Plan, Petroske's medical records, and the Plan's records with respect to Petroske's claim for benefits.  Kohler also enclosed a letter from Dr. Dennis Schultz, M.D., of QuadMed Occupational Medicine, "who conducted a thorough and independent review of Mr. Petroske's records and claim."

Dr. Schultz reviewed Petroske's medical records.  He discussed Petroske's medical visits in June 2010 and April 2010.  He also discussed the January 25, 2010 visit with Dr. Dove, in

---

[9]     While the parties do not draw attention to the following, the Court notes that on September 9, 2010, Marshall also submitted medical records from Twin Cities Spine Center pertaining to Petroske and requested that these records be added for consideration regarding Petroske's appeal.  These records pertained to Petroske's back pain, rather than his headaches.  However, Petroske noted in these forms, which he filled out on November 25, 2008, that he could lift heavy weights, could not walk more than half a mile, could "sit in any chair as long as I like," could "stand as long as I want but it gives extra pain," that he could perform "all that is required of me" with respect to his normal homemaking/job activities, that his "social life is normal but increases the degree of pain," and that he could "travel anywhere but it gives extra pain."  Further, Petroske noted that he expected as a result of his treatment at the Spine Center that it would be "very likely" that he would "be able to do more sports, go biking, or go for long walks."  He also thought it "very likely" that he would "be able to do more everyday household or yard activities" and "be able to sleep more comfortably."  The only result he believed was "not likely" was that he would be able to return to his usual job.  Petroske also noted that he exercises for at least 20 minutes once a week.

which Petroske's physical exam was "perfectly normal" and Dr. Dove's "impression was

orthostatic headaches (headaches when standing upright) and night time leg cramps."  He then

reviewed the 2007 medical records pertaining to Petroske's back pain, surgery, and recovery.

Dr. Schultz noted that Petroske's surgeon suggested that Petroske "increase activities with

conditioning and exercises."  Dr. Schultz then discussed Petroske's 2005 visits with neurologist

Dr. Hall, at which time Dr. Hall believed Petroske's "orthostatic hypotension (drop in blood

pressure with standing) had resolved with treatment."  Dr. Schultz noted that Dr. Hall believed

Petroske had a primary headache disorder that "should be approached in the same manner as

other chronic recurrent headaches."  Dr. Schultz then briefly noted the earlier evaluations

performed prior to 2005, including Petroske's medical workups at Fairview University Medical

Center, Mayo Clinic, and the University of Minnesota.  Dr. Schultz concluded,

> In summary, this information does not provide documentation
> supporting the claim that Mr. Petroske is totally disabled from all jobs at
> this time.  The most recent exams by his neurologist and orthopedist were
> both normal.  The only abnormality his primary care physician identified
> was decreased sensation in his toes with monofilament testing.  Dr. Hall's
> last note from 2005 summarized relevant, diagnoses from Mr. Petroske's
> Mayo evaluation.  It indicated that his orthostatic hypotension had
> resolved.  His headaches represented a primary headache disorder and
> should be managed as such.  Notes from his primary physician indicated
> his diabetes (type II), sleep apnea, hypertension and elevated cholesterol
> were under appropriate medical management.  None should require limits.
> Mr. Petroske underwent lumbar surgery in 2007 for back and leg
> complaints.  Records, two notes from Dr. Schwender indicate the surgery
> was successful.  Again, no restrictions appeared to be needed.  Mr.
> Petroske's BMI is elevated at 40 placing him in class III obesity category.
> Morbid obesity can affect a person's ability to work.  But records do not
> indicate this is the case for Mr. Petroske.
>
> Overall there isn't clear documentation for total disability.
> Restrictions for light, predominantly sit down work may be justified.

Based in part on Dr. Schultz's letter, Kohler's denial letter stated:

It is evident from the medical reviews conducted with respect to Mr. Petroske's claim, including Dr. Schultz's most recent review, that Mr. Petroske[] is not totally disabled as that term is defined at page 10 of the Plan.  As noted at Page 9 of the Plan, Mr. Petroske is required to be totally disabled in order to receive benefits under the Plan.  The medical reviews, which were conducted with respect to Mr. Petroske's claim and subsequent appeals, came to the same consistent determination which was that Mr. Petroske should be able to be employed in some capacity.  Based on the above and in accordance with the Plan provisions at pages 9 and 10, Mr. Petroske's appeal is respectfully denied.

## II.    DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B.  Denial of Benefits - Standard of Review

A participant in an ERISA plan may bring suit "to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  Typically, a court reviews de novo a denial of benefits challenged under that section.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  However, when a plan gives discretionary authority to the plan

administrator or reviewing committee to determine eligibility for benefits or to construe the terms of the plan, a court reviews the decision to deny benefits for an abuse of discretion. *Id.* The parties agree that Kohler's Plan, which states that "your disability must be medically verified and satisfactory to the Company," confers such discretion.

Petroske argues that in this case, a less deferential sliding-scale standard of review is appropriate. To obtain a less deferential standard, Petroske "must present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [him]." *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998). A conflict of interest no longer triggers application of the sliding-scale approach, but instead "is simply one of several factors considered under the abuse of discretion standard." *Wrenn v. Principal Life Ins. Co.*, 636 F.3d 921, 924 n.6 (8th Cir. 2011); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

Petroske contends that Kohler committed a serious procedural irregularity by failing to utilize a specialist, particularly a neurologist, in its review of Petroske's claim. A plan administrator's reliance on the opinions of its in-house physicians is not, by itself, a procedural irregularity warranting a less deferential review of the plan administrator's denial decision. *See Kolosky v. UNUM Life Ins. Co. of Am.*, No. 05-1364, 2006 WL 1379633, at *2 (8th Cir. May 22, 2006) (unpublished). Rather, the Court must determine whether the administrator's decision was "made without knowledge of or inquiry into the relevant circumstances and merely as a result of its arbitrary decision or whim." *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 838 (8th Cir. 2006). This requirement "presents a considerable hurdle" that few plaintiffs surpass. *Sahulka v. Lucent Techs., Inc.*, 206 F.3d 763, 768 (8th Cir. 2000). A plan administrator's failure to obtain the opinion of a specialist may constitute a procedural irregularity when it relies solely on the

opinion of an in-house consultant whose opinion contradicts the remainder of the record. *See Woo*, 144 F.3d at 1161. In such a case, the administrator may be found to have reached a decision "without reflection and judgment." *Id.*

Kohler's decision was based largely upon the independent review conducted by Dr. Schultz, who is employed by QuadMed and board certified in occupational medicine. Petroske argues that Dr. Schultz has no experience with Petroske's conditions, which he asserts include POTS, orthostatic headaches, postural headaches, and postural intolerance. Citing *Payzant v. UNUM Life Ins. Co. of Am.*, 402 F. Supp. 2d 1053, 1062 (D. Minn. 2005), Petroske argues that where a plaintiff suffers from an "uncommon disease," a serious procedural irregularity exists where a defendant fails to have a plaintiff's claim reviewed by an expert, but instead relies on a consultant's review of the plaintiff's claim. Petroske also asserts that Dr. Schultz's opinion contradicted the rest of Petroske's medical record.

First, the Court notes that Petroske does not articulate which of his current conditions are allegedly "uncommon" and thus warrant special expertise. He generally refers to his "various diagnoses" and diagnoses of POTS, orthostatic headaches, postural headaches, and postural intolerance. *See* Pl.s Mem. Supp. Summ. J. 13-14. In his Reply Memorandum, Petroske identifies POTS as his "uncommon disease." Pl.s' Reply. Mem. 2. His current diagnoses as of 2010, however, did not include POTS, and his medical records indicate that POTS was no longer considered a likely diagnosis as of September 2004. His diagnoses in 2010 were headaches and postural intolerance. There is no evidence that these conditions are "uncommon" or that they require treatment by a specialist, particularly a neurologist. While Petroske had previously seen a number of neurologists, there was no indication of any neurological abnormalities requiring the continuing expertise of a neurologist. In fact, Petroske's treating neurologist, Dr. Dove, had not

seen Petroske at all between June 2007 and January 2010.  Moreover, Petroske has not presented any evidence that Dr. Schultz lacks experience with headache disorders.[10]

Further, Petroske has not presented evidence that Kohler reached its decision without proper investigation.  In *Payzant*, because of the subjective nature of the plaintiff's disease, the plaintiff's physicians requested a functional capacity evaluation (FCE) and also wanted to discuss the plaintiff's diagnosis with the insurer.  *Payzant*, 402 F. Supp. 2d at 1062.  The insurer, however, ignored those requests and insisted on objective evidence to support plaintiff's diagnosis of fibromyalgia, a disease diagnosed purely by subjective evidence.  *Id.*  In contrast, Petroske's doctors did not request additional evaluations or indicate that personal communication with Kohler was necessary.  Moreover, unlike in *Payzant*, Kohler did not dispute Petroske's diagnoses.  Rather, Kohler's Plan Administrator relied on Petroske's medical records, including the notes and diagnoses from his treating physicians.  The Plan Administrator did not disagree with the medical facts, but instead disagreed with the conclusions drawn from those facts regarding whether Petroske fell within the Plan's definition of "totally disabled."

Dr. Schultz's opinion also did not contradict the remainder of Petroske's medical record. While his opinion was different from that of Dr. Dove, it was consistent with Dr. Hall's opinion,

---

[10]     Petroske also argues that Kohler failed to comply with 29 C.F.R. 2560.503-1(1)(h)(3)(iii) and (4), which requires that when a determination is based on a "medical judgment," a plan administrator must consult with a "health care professional who has appropriate training and expertise in the field of medicine involved."  Kohler contends that this regulation does not even apply, since the Plan Administrator did not disagree with the underlying medical facts, so it was not a decision based on "medical judgment."  Rather, Kohler asserts, the dispute is over the conclusion that Petroske is "totally disabled" after applying the Plan to the undisputed medical facts. *See Stanford v. Cont'l Cas. Co.*, 455 F. Supp. 2d 438, 445 (E.D.N.C. 2006) (finding that defendant did not violate the regulation because "defendant has never questioned the findings of plaintiff's treatment providers" and "that at all times, defendant's only question has been whether, under the terms of the policy, those findings constitute disability").  The Court finds it unnecessary to address this issue, because even if the regulation does apply in this context, there is no evidence that Dr. Schultz did not have the appropriate training and expertise to review Petroske's medical information.

James Jost's review, and the lack of objective medical findings in the record.  Kohler conducted substantial inquiry into the relevant circumstances, relying on the two medical reviews as well as Petroske's activity report and the submissions by his treating physician.  Moreover, Kohler never questioned Petroske's diagnoses—it only disputed whether his condition was sufficiently severe to completely disable him from performing any occupation.  This is not a case "where the plan trustee failed to inquire into the relevant circumstances at issue, or never offered a written decision that can be reviewed, or committed irregularities so severe that the court 'has a total lack of faith in the integrity of the decision making process.'"  *Pralutsky*, 435 F.3d at 838 (citation omitted).  Petroske has not demonstrated that Kohler reached its decision "without reflection and judgment."  Instead, this appears to be a disagreement about whether that judgment was correct.  Under these circumstances, the Court cannot conclude that Petroske made the necessary showing to trigger a departure from the abuse of discretion standard.

When reviewing for abuse of discretion, a court will reverse a plan administrator's decision only if it is "arbitrary and capricious."  *Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 701 (8th Cir. 2008).  The plan administrator's decision should be upheld as long as the administrator provides a "reasonable explanation for its decision, supported by substantial evidence."  *Ratliff v. Jefferson Pilot Fin. Ins. Co.*, 489 F.3d 343, 348 (8th Cir. 2002).  Substantial evidence is more than a scintilla but less than a preponderance.  *Leonard v. Sw. Bell Corp. Disability Income Plan*, 341 F.3d 696, 701 (8th Cir. 2003).  In conducting the review, a court focuses on whether a "reasonable person *could* have reached a similar decision . . . not that a reasonable person *would* have reached that decision." *Phillips–Foster v. UNUM Life Ins. Co. of Am.,* 302 F.3d 785, 794 (8th Cir.2002) (internal quotation marks omitted).

**C.  Kohler's Decision to Deny Benefits**

Kohler contends that it is entitled to summary judgment because its decision to terminate Petroske's benefits was reasonable and supported by substantial evidence.  Kohler terminated Petroske's benefits because it found that there was no clear documentation that Petroske was unable to perform any occupation, and was thus not totally disabled under the Plan.  Kohler supports its decision with the medical reviews performed by James Jost and Dr. Schultz, Petroske's recent medical records, the Attending Physician's Supplemental Medical Reports completed by Dr. Dove, and the Activity Report completed by Petroske.  Petroske asserts that Kohler's decision was arbitrary and capricious because, according to Petroske, the medical record consistently contained documentation of his disability and contained no evidence showing that Petroske was able to work.  Further, Petroske argues, the fact that Kohler had a conflict of interest, Kohler had previously paid LTD benefits to Petroske prior to termination, and the Social Security Administration found that Petroske was disabled, demonstrate that Kohler's decision was unreasonable.

When reviewing a denial of benefits, the court "reviews the claims administrator's final decision to deny a claim, rather than the initial denial." *Galman v. Prudential Ins. Co. of Am.*, 254 F.3d 768, 770-71 (8th Cir. 2001); *see also Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010).  Petroske argues that the court may not consider information contained within Kohler's initial denial letter.  The final denial letter, however, includes all of the relevant information.  The final denial letter explained that the decision was based on the terms of the Plan, Petroske's medical records, and the Plan's records with respect to Petroske's claim for benefits.  The "Plan's records" includes all of the submissions by Petroske and his physicians. The final denial letter also refers to the "medical reviews . . . including Dr. Schultz's most recent

21

review . . . which were conducted with respect to Mr. Petroske's claim and subsequent appeals."

There were only two medical reviews—one by James Jost and one by Dr. Schultz—and so by

referring to multiple medical reviews, Kohler was necessarily referring to both Jost's and Dr.

Schultz's reviews.  Under 29 C.F.R. § 2560.503-1(j), the denial letter must set forth the reasons

for the adverse determination, but it "does not require the plan administrator to discuss specific

evidence submitted by the claimant."  *Midgett v. Wash. Grp. Int'l Long Term Disability Plan*,

561 F.3d 887, 896 (8th Cir. 2009).  The final denial letter sufficiently set forth the reasons for

terminating Petroske's LTD benefits, including reference to Petroske's submissions, Dr. Dove's

reports, and the reviews conducted by Jost and Dr. Schultz.

## 1.  *Conflict of Interest*

Petroske asserts that Kohler, as a claims administrator who both evaluates and pays

benefits, has a conflict of interest that should be considered when evaluating its decision to deny

benefits.  *See Khoury*, 615 F.3d at 953–54 (citing *Glenn*, 554 U.S. at 117).  A conflict of interest

alone is insufficient to find that an administrator abused its discretion in denying benefits, but it

is one of several factors to consider and "may serve as a tiebreaker if the other factors are closely

balanced." *Glenn*, 554 U.S. at 117.  The weight given to a conflict of interest varies depending

on the circumstances of the case.  For example, it may be more important in "cases where an

insurance company administrator has a history of biased claims administration," or it may be less

important "where the administrator has taken active steps to reduce potential bias and to promote

accuracy."  *Id.*  Here there is no evidence either of any history of biased claims administration or

active steps Kohler has taken to reduce potential bias.  Given the other factors which strongly

support the reasonableness of Kohler's determination, the Court does not find that the alleged

conflict of interest tips the scale in favor of Petroske.

### 2.   *Previous Payment of Benefits*

Kohler paid Petroske LTD benefits for approximately five years before terminating the payments.  Petroske asserts that there is no evidence that his medical conditions have improved since he was initially found eligible to receive LTD benefits and that Dr. Dove's Attending Physician's Statements consistently show that Petroske's condition has remained unchanged. The absence of evidence of improvement, he contends, supports a finding that Kohler's decision to terminate his benefits was arbitrary and capricious.

The Eighth Circuit has recognized that the payment of benefits does not operate "forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002).  *McOsker* refers only to the "information available" to the insurer—it does not require that the plaintiff's underlying medical condition improve or alter in some significant way.  *Id.*; *see also Ellis v. Liberty Life Assurance Co. of Bos.*, 394 F.3d 262, 274 (5th Cir. 2004) (holding that "when a plan fiduciary initially determines that a covered employee is eligible for benefits and later determines that the employee is not . . . eligible for those benefits by virtue of additional medical information received, the plan fiduciary is not required to obtain proof that a substantial change in the LTD recipient's medical condition occurred *after* the initial determination of eligibility" and noting that "[a] contrary holding would basically prohibit a plan fiduciary from ever terminating benefits if it later discovered evidence that the ERISA plaintiff was not disabled at the time of the initial grant of benefits" and that "such a rule would have a chilling effect on the promptness of granting initial benefits in the first place"); *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290

(9th Cir. 2010) (affirming the district court's decision that the plaintiff was not "totally disabled" and that the insurer could terminate his disability benefits even absent evidence that the plaintiff's medical condition had changed over the time he had been receiving benefits).

The information available to Kohler in 2010 was significantly different than the information available to Kohler in 2004 and 2005, when it made its initial determinations of eligibility. In 2005, Petroske was complaining of symptoms including lightheadedness, dizziness, fatigue, headaches, shortness of breath, double vision (diplopia), droopy eyelids, and facial numbness. Kohler had opinions from both Dr. William Evans at the Mayo Clinic and Dr. Dove that Petroske was disabled. During that time, Petroske was still undergoing extensive evaluations to determine the cause of his symptoms, and his physicians had a number of working diagnoses, including diseases such as myasthenia gravis and POTS. His physicians reported objective findings of orthostatic hypotension and positional blood pressure/heart rate abnormalities.

However, in 2010, when Kohler terminated Petroske's benefits, many of his previous diagnoses had been ruled out through laboratory testing and other diagnostic studies. As of January 25, 2010, his only complaints were "orthostatic intolerance and headaches" and nocturnal leg cramps. None of his recent medical records revealed any abnormal physical exam findings, blood pressure irregularities, or other notable test results. The medical records no longer indicated complaints of diplopia,[11] and Petroske's orthostatic hypotension had apparently resolved. Thus, when Kohler terminated Petroske's benefits, the only thing supporting a finding of disability was Dr. Dove's unsupported conclusions that Petroske suffered from disabling headaches. This is significantly different than when Kohler initially granted Petroske's benefits.

---

[11]     Although Dr. Dove's Attending Physician's Statements make a cursory remark regarding diplopia, there are no complaints of this symptom in Petroske's recent medical records.

Further, when Kohler conducted its periodic review, it requested additional submissions from Petroske. These submissions included additional evidence that Kohler used when making its decision to terminate Petroske's benefits. Thus, when Kohler decided to terminate Petroske's benefits, it considered newly available information consisting of: Petroske's September 29, 2009 Activity Report;[12] Dr. Dove's October 2009 Attending Physician's Supplementary Medical Report; Dr. Dove's February 2010 Attending Physician's Supplementary Medical Report; office notes from Petroske's appointment with Dr. Dove on January 25, 2010; the August 2010 Residual Functional Capacity (RFC) Questionnaire, completed by Dr. Dove; notes from Petroske's visit with Dr. Moses in April 2010; and the two new medical reviews conducted by James Jost and Dr. Schultz. Because there was ample additional information available to Kohler in 2010 when it made its decision to terminate Petroske's disability benefits, the Court affords little weight to Kohler's previous payment of benefits.

### 3. Social Security Disability Benefits

Petroske argues that the Court should give some weight to the fact that in 2005, the Social Security Administration found Petroske disabled. The decision of the Social Security Administration, however, is not binding on either Kohler's plan administrator or the Court. *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1053-54 (8th Cir. 2011); *Reidl v. Gen. Am. Life Ins. Co.*, 248 F.3d 753, 759 n.4 (8th Cir. 2001). The evidence presented to the Social Security Administration in 2005 was significantly different from the evidence before Kohler in 2010. First, as described above, Kohler had information available in 2010 that was not available to the

---

[12]      Notably, Petroske's self-completed activity report in 2009 did appear to indicate some improvement in Petroske's condition. In 2004, Petroske's activity report indicated that the only hobby in which he engaged was "sitting in a boat for an hour or two." In 2009, he reported that he could engage in gardening, fishing, hunting, and camping. In 2004, Petroske reported that he was unable to drive a car. In 2009, he reported that he could drive 20 to 25 miles if he "fe[lt] up to it."

Social Security Administration in 2005.  This is evidenced by the fact that the ALJ found

restrictions that differed markedly from the restrictions Dr. Dove found in 2010.[13]  Further,

Social Security cases are more deferential to the opinions of the claimant's treating physicians.

In cases involving the denial of Social Security benefits, "an administrator who rejects [the]

opinions [of a claimant's treating physician] [must] come forward with specific reasons for his

decision, based on substantial evidence in the record."  *Black & Decker Disability Plan v. Nord*,

538 U.S. 822, 828 (2003).  This "treating physician rule," however, does not apply to ERISA

claims.  *Id.* at 834.  Because of the five-year time gap between the Social Security

Administration determination in 2005 and Kohler's determination in 2010, as well as the

significant change in the information available during that time, the Court does not give the

Social Security Administration's determination of disability much weight.

**4.   Consideration of Relevant Evidence**

Petroske argues that Kohler abused its discretion when it ignored Dr. Dove's opinions

that Petroske was totally disabled, and instead relied upon the opinion of its reviewing physician,

Dr. Schultz.  Petroske asserts that Kohler ignored relevant evidence—consisting primarily of Dr.

Dove's opinions regarding Petroske's ability to work.  Petroske also argues that Kohler failed to

discuss Petroske's condition with his treating physicians, failed to explicitly rebut or

acknowledge the opinions of Petroske's treating physicians, failed to provide a "meaningful

explanation" as to why it gave greater weight to Dr. Schultz's opinion over Dr. Dove's, and

inappropriately focused on the absence of abnormal examination findings.

---

[13]     Despite the fact that the ALJ believed that more severe restrictions were necessary than
did Dr. Dove, the ALJ nevertheless believed Petroske was capable of part-time sedentary work.
It was not unreasonable, therefore, for Kohler to believe that with less severe restrictions in 2010,
Petroske could perform more work.

"A plan administrator abuses its discretion when it ignores relevant evidence." *Willcox v. Liberty Life Assur. Co. of Bos.*, 552 F.3d 693, 701 (8th Cir. 2009). The Supreme Court has held that ERISA plan administrators are not required to give special deference to the opinions of treating physicians. *Nord*, 538 U.S. at 825; *Midgett*, 561 F.3d at 897. "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Nord*, 538 U.S. at 834. "But . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.*; *see also Dillard's Inc. v. Liberty Life Assurance Co. of Bos.* 456 F.3d 894, 899 (8th Cir. 2006) ("[A] plan administrator has discretion to deny benefits based upon its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians unless the record does not support the denial."); *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 925 (8th Cir. 2004) (finding that the defendant "was not obligated to accord special deference to the opinion of . . . the treating physician[] over the conflicting opinion of . . . the reviewing physician"); *Payzant*, 402 F. Supp. 2d. at 1062 ("While it might be preferable for insurance company doctors to examine claimants in person, they are not usually required to do so, and [defendant] need not give any special deference to the conclusions of [plaintiff]'s treating physicians over its own in-house reviewing physicians.").

Petroske cites *Willcox v. Liberty Life Assurance Co. of Boston*, 552 F.3d 693 (8th Cir. 2009) and *Norris v. Citibank, N.A. Disability Plan (501)*, 308 F.3d 880 (8th Cir. 2002) to support his argument that Kohler abused its discretion by ignoring relevant evidence. But neither case is analogous to Petroske's situation. *Willcox* involved reviewing physicians whose cursory reviews

contained multiple factual inaccuracies, including erroneous statements that there was "no objective evidence" of the claimant's disease when, in fact, there were a number of documented abnormal findings in the record. *Willcox*, 552 F.3d at 701-02. In that case, the defendant abused its discretion by relying on the reviewing physicians' "demonstrably incorrect conclusion[s]." *Id.* at 701. Petroske, however, points to no factual inaccuracies in Dr. Schultz's review or specific factual information that Dr. Schultz ignored. Petroske contends that although Dr. Dove has seen Petroske a number of times over the years, Dr. Schultz only discussed Petroske's January 2010 visit with Dr. Dove and ignored all the previous visits. Petroske fails, however, to point to any examination findings, test results, or other medical evidence contained in the notes from those previous visits with Dr. Dove that could or should have affected Dr. Schultz's analysis. Further, unlike the reviewing physician in *Willcox*, Dr. Schultz did not disagree with Dr. Dove's diagnoses—he only disagreed with Dr. Dove's ultimate conclusions regarding Petroske's ability to perform any occupation.

In *Norris v. Citibank, N.A. Disability Plan*, the Eighth Circuit found that a plan administrator abused its discretion when it failed to "address the extensive medical evidence relating to [plaintiff]'s disability or the consistent conclusions of her doctors and various [plan] personnel that she could not work." 308 F.3d at 885. In that case, not only was there little, if any, evidence from which a reasonable person could find that the plaintiff was not disabled under the terms of the plan, but there was also extensive and consistent evidence that she was so disabled. *Id.* In contrast, here, there is not "extensive medical evidence" relating to Petroske's disability. The opinion from Mayo was rendered in 2004, before most of Petroske's medical evaluations had been performed and before a number of diagnoses had been excluded. By 2010, the only evidence of Petroske's disability was Dr. Dove's conclusory opinion, unsupported by

medical data, that Petroske was unable to work.  There were no physical examination findings,

laboratory results, or other objective data to support Petroske's claim of disability.  Further,

when Dr. Dove rendered his opinion in October 2009, he had not even seen Petroske since June

2007.  The record also contained the opinions of James Jost, Dr. Schultz, and Dr. Hall, who all

believed that Petroske could return to some occupation.  Thus, unlike in *Norris*, there was not

"extensive medical evidence" or "consistent conclusions" of Petroske's disability.

Kohler was not required to give Dr. Dove's opinions special deference.  *Nord*, 538 U.S.

at 825.  Nor may the Court impose on Kohler a "discrete burden of explanation" when it credited

other reliable evidence that conflicted with Dr. Dove's evaluation.  *Id.* at 834.  It was reasonable

for Kohler to credit the opinions of James Jost and Dr. Schultz over that of Dr. Dove.  Notes

from Petroske's recent medical visits contained no information supporting a finding of total

disability.  Dr. Dove cited no objective medical data to support his conclusion that Petroske was

unable to work.  In fact, Dr. Dove had not even seen Petroske in over two years when he

submitted to Kohler the 2009 Attending Physician's Statement.  Both Jost and Dr. Schultz

completed a thorough review of the medical records, and Petroske has not pointed to any specific

medical evidence that they omitted or ignored.  Moreover, Dr. Dove's conclusions appear to be

inconsistent.  For example, in July 2005, Dr. Dove noted that Petroske's headache was "more of

a nuisance type headache" and that it was "not very severe," tending to be only a "4/10."  In

January 2010, he described the headaches as merely "bothersome."  These statements are

inconsistent with a finding that the headaches are "incapacitating."  Dr. Dove also consistently

noted that Petroske's headaches had remained "unchanged" since 2005.  But in 2005, Dr. Dove

classified Petroske's physical impairment as a "Class 3," from 2006-2009 he classified it as a

"Class 5," and then in 2010 classified it as a "Class 4."[14]   The General RFC Questionnaire that

Dr. Dove completed in 2010 only noted "increased headaches with standing" and that Petroske

was unable to "stand up continuously for more than 90-120 minutes."  It said nothing of

Petroske's alleged inability to sit.  Thus, although Dr. Dove opined that Petroske was totally

disabled from performing any employment or occupation, the factual statements within Dr.

Dove's submissions did not clearly or consistently lead to that conclusion.

       An insurer is permitted to terminate disability benefits on the basis of a lack of objective

evidence or abnormal examination findings.  *See McGee*, 360 F.3d at 924-25 (8th Cir. 2004) ("It

is not unreasonable for a plan administrator to deny benefits based upon a lack of objective

evidence.").  Although Kohler did not dispute Petroske's underlying diagnoses, it was not

unreasonable for Kohler to require objective evidence of Petroske's disability.  *See Hunt v.

Metro. Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005) (upholding the denial of LTD benefits

where the insurer accepted the claimant's diagnosis but required objective evidence of

impairment).  The medical record and Petroske's submissions to Kohler did not contain any

physical examination findings, laboratory results, imaging or other diagnostic studies, or any

other objective data to support his claim that he was unable to perform any type of occupation.

Kohler did not abuse its discretion by denying benefits based on a lack of objective evidence of

disability.  *See id.*

       Further, contrary to Petroske's assertion, Kohler was not required to discuss Petroske's

condition with his treating physicians.  None of Petroske's physicians requested to speak with

---

[14]      Moreover, the Court notes that between 2006 and 2009, when Dr. Dove consistently reported that Petroske's physical impairment was a "Class 5," the Attending Physician Statements appear to be almost identical copies of each other, with only very minor variances.  In fact, the November 28, 2006 Statement is a verbatim copy of the January 23, 2006 Statement, albeit in different handwriting.  Thus, it would not have been unreasonable for Kohler to afford what appeared to be merely copied statements little weight.

Kohler or indicated that further communication regarding Petroske's conditions was necessary or desirable.  Petroske has not shown what additional information such a discussion would have yielded.  Although Kohler did not ask Petroske to obtain a functional capacity evaluation or independent medical evaluation, there is no evidence that these measures were recommended or deemed necessary by his physicians.  Kohler found that Dr. Dove's Attending Physician's Statements, the RFC Questionnaire, and notes from Petroske's office visits provided sufficient information from which to make a disability determination.  There is no evidence as to what additional information Kohler should have obtained or how such information would have affected Kohler's analysis.

The Court cannot "substitute its own judgment for that of the decisionmaker."  *Dillard's*, 456 F.3d at 899.  Here, there was substantial evidence to support Kohler's decision to terminate Petroske's LTD benefits.  Kohler's decision was therefore reasonable and Kohler did not abuse its discretion.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.  Kohler's Motion for Summary Judgment [Docket No. 12] is GRANTED.

2.  Summary Judgment in favor of Kohler is GRANTED on Petroske's ERISA claim.

3.  Petroske's Motion for Summary Judgment [Docket No. 14] is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: February 24, 2012

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge